This is an appeal from a Pickaway County Common Pleas Court judgment of conviction and sentence. The jury found Martin L. Hatton, defendant below and appellant herein, guilty of the following offenses: (1) aggravated burglary in violation of R.C. 2911.11; (2) kidnapping in violation of R.C. 2905.01; (3) felonious assault in violation of R.C. 2903.11; (4) rape in violation of R.C. 2907.02; and (5) theft in violation of R.C.2913.02.
Appellant raises the following assignments of error for review:
FIRST ASSIGNMENT OF ERROR:
 "APPELLANT WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, [SECTION] 16 OF THE OHIO CONSTITUTION."
SECOND ASSIGNMENT OF ERROR:
 "APPELLANT'S RIGHT TO A FAIR TRIAL WAS DENIED BY PROSECUTORIAL MISCONDUCT THROUGHOUT THE TRIAL IN CONCERT WITH THE JUDICIAL MISCONDUCT OF PASSIVITY OR PERMISSIVENESS TOWARD SUCH CONDUCT."
THIRD ASSIGNMENT OF ERROR:
 "THE STATE'S FAILURE TO DISCLOSE EXCULPATORY EVIDENCE MATERIAL TO APPELLANT'S INNOCENCE DEPRIVED HIM OF A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, [SECTION] 16 OF THE OHIO CONSTITUTION."
FOURTH ASSIGNMENT OF ERROR:
 "APPELLANT'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
FIFTH ASSIGNMENT OF ERROR:
 "THE RAPE AND FELONIOUS ASSAULT CHARGES SHOULD HAVE BEEN MERGED AND THE THEFT CHARGE DISMISSED."
SIXTH ASSIGNMENT OF ERROR:
 "APPELLANT WAS DENIED HIS RIGHT TO A SPEEDY TRIAL UNDER RC [SIC] 2945.71."
Our review of the record reveals the following pertinent facts. On January 18, 1997, at approximately 1:17 a.m., seventeen year old Jillian awoke to the sound of footsteps in her bedroom. Shortly thereafter, Jillian felt a gloved hand covering her mouth and saw a strange man's face inches away from her. The man held a knife to Jillian's neck and told her that she "better really love [her] parents, that if [she] screamed or made any noise he was going to kill" her family. The man raped Jillian in her bedroom and then took her downstairs to the family room. Once downstairs in the family room, a second man raped Jillian. While the second man was raping Jillian, the first man left the room. When the first man came back, he told the second man that they had to leave. The second man stated that he was not ready to leave because he was "not done" with Jillian.
Jillian and the two men heard footsteps upstairs. Jillian's father, Paul, hearing footsteps in the house, had woken up to investigate. As he proceeded down the stairs, he heard someone say "Let's get the hell out of here. Someone's coming." Paul saw the first man fleeing the residence. The second man ran into Paul. The two men struggled. During the struggle, the second man was yelling, "Marty, Marty, Marty!" He told Paul, "My buddy's got a gun, he will come in and kill you all." Paul asked the second man who Marty is, and the man replied, "I don't know why I am here. I came with Marty Hatton."
As Paul was struggling with the second man, Jillian ran upstairs to her parents' bedroom to find her mother. Jillian told her mother what happened and telephoned 911.
Between 2:17 and 2:30 a.m., the police arrived. Circleville Police Sergeant Wayne Gray and Circleville Police Officer David Haynes were the first officers on the scene. As Sergeant Gray entered the front door, he saw Paul standing over the second man, who was laying on the floor and was yelling, "Where's Marty?" The second man said several times that he had been at the residence with "Marty". Sergeant Gray told the man that he did not know who "Marty" was. The second man stated it was "Marty Hatton." The officers learned that the second man was Ricky Dunn. The officers arrested Dunn and, when additional officers arrived on the scene, began searching for Hatton. The officers did not, however, find Hatton.
After looking through the house, Paul learned that his wife's wedding and engagement rings and his wife's watch, which his wife took off to do the dishes and had placed by the kitchen sink, were missing. Additionally, two money clips, a small amount of cash, a cam corder, and a cam corder case were missing from Paul's office. A set of keys was missing from one of the cars.
Jillian went to the hospital for a post-sexual assault examination. Dr. Alice Frazier performed the examination and found that Jillian's injuries and condition were consistent with her statement that she had been raped. Dr. Frazier collected various evidence, including pubic hair samples and fluid samples, to send to the police for analysis. During her collection of the pubic hair sample, Dr. Frazier discovered one black pubic hair.
Meanwhile, the law enforcement officers secured the scene. Circleville Police Investigators Robert Chapman and Jack Clark processed the crime scene. In the family room where the individual later identified as Ricky Dunn raped Jillian, the officers discovered a silver lock blade knife on the couch. The officers sent the knife to the Bureau of Criminal Identification and Investigation ("BCI") to determine whether any fingerprints were on the knife.
Sheryl L. Mahan, a BCI latent fingerprint examiner, testified that the knife did not contain any prints with sufficient ridge detail to provide a positive fingerprint identification. Specifically, her report stated: "An examination of the [knife] did not reveal any latent print that contained sufficient ridge detail for comparison purposes." Mahan translated the statement to mean that she examined the knife for latent prints and, while some fingerprints were on the knife, they were insufficient for comparison purpose. She testified that latent fingerprints are extremely fragile. If an individual improperly packages the item or if an individual smudges the print with his hand or with a glove, the print likely will not contain sufficient detail to compare.
Following his arrest and at trial, Dunn explained the events surrounding the burglary and rape as follows. Dunn testified that he was with appellant on the night of January 17, 1997. Dunn and appellant went to the Match Box Tavern. After leaving the bar, Dunn and appellant went to Chatham Drive. Appellant told Dunn they were going to Chatham Drive to talk to a friend of appellant's. When they got to Chatham Drive, appellant told Dunn that he was going to rob a house. Dunn stated that he thought appellant was kidding. Appellant told Dunn that "he would leave [Dunn] laying on the ground if [Dunn] didn't do it." Appellant and Dunn went to one house, but could not open the door. They then went to the next house and walked around the side entrance to the garage. Appellant opened the door with a credit card. Appellant and Dunn entered the garage and appellant began looking through the cars. Appellant found a set of keys in one of the cars.
Appellant entered the house while Dunn remained in the garage. Some time later, appellant returned to the garage and told Dunn to come inside. When Dunn entered the house, he saw Jillian standing against the wall. Dunn said Marty was laughing, stating, "Look at this," — "seventeen years old." Dunn told appellant, "Oh, no, don't do this. Let's get out of here." Dunn stated appellant would not listen to him.
Appellant told Dunn that he had sex with Jillian and that Dunn was also going to have sex with her. Dunn told appellant, "no way, I am not going to do that." Dunn again told appellant that they should leave. Appellant grabbed Jillian, held the knife to her neck and said if Dunn did not have sex with Jillian, appellant would kill her.
Appellant led Jillian into the family room and told Jillian to lay down on the couch. Appellant told Dunn to get on top of her. Appellant held the knife to Jillian's neck and told her not to make any noise. Appellant shone a flashlight on Jillian and Dunn to make sure that Dunn was having sex with her. Dunn stated that he was not able to have sex with her because he was scared. Approximately five minutes later, Dunn heard someone coming downstairs. Appellant said, "Let's get the hell out of here, somebody is coming." Dunn replied, "I am not ready yet." Dunn stated he did not want to leave with appellant because he was afraid appellant would kill him and Jillian. Dunn later informed the officers that appellant had been wearing a dark colored sweatshirt on the night in question.
On January 18, 1997, at approximately 8:36 a.m., Circleville Police Officer Kevin Clark and Pickaway County Sheriff's Department Sergeant Mike Wears went to appellant's house to question him about his whereabouts during the preceding night and about Dunn's allegations. The officers informed appellant that Dunn had stated that appellant had been involved in a burglary and a rape at the Chatham Drive residence during the overnight hours. Appellant told the officers that he had no idea what the officers were talking about. Appellant stated that he had not seen Dunn the previous evening. Appellant stated that on the previous evening, he returned home shortly before midnight. He and his wife watched a movie and went to bed.
Appellant informed the officers that he was willing to help out in any way that he could and that he was not involved in the crimes. The officers asked appellant for the clothes he had been wearing the previous evening, and appellant gave them a pair of jeans, a sweater, a shirt, and a pair of underwear. Appellant did not turn over a dark colored sweatshirt. The officers also asked appellant to voluntarily accompany them to the police station for a line-up.
At the police station, appellant voluntarily participated in a line-up. The victim could not, however, identify the perpetrator. Officer Clark then took appellant into an interview room. Officer Clark wanted to ask appellant some questions about Dunn's allegations, but appellant made it clear that he wanted to speak with an attorney. Officer Clark told appellant that was completely his choice. Officer Clark stated that the officers had discovered that appellant was in Laurelville with Dunn on the night in question. Appellant stated that he was in Laurelville. Officer Clark reminded appellant that appellant stated he wanted an attorney. Officer Clark asked appellant whether appellant was certain he wanted to say anything without an attorney. Appellant responded, "Yes. I was in Laurelville." Appellant continued talking despite Officer Clark's continued remarking that appellant had stated he wanted an attorney. Appellant responded that he wanted to help clear his name and that he did not do anything wrong.
Appellant asked Officer Clark what he could do to clear his name. Officer Clark stated that the police would need blood and pubic hair samples, and that they would need to search his house. Appellant agreed to provide the samples and to let the police search his house.
During the search of appellant's home, the officers took a dark colored sweatshirt from the closet located in the master bedroom. The sweatshirt had a dried white substance on it which the officers suspected to be semen. Anita Hatton confirmed that appellant had been wearing the sweatshirt on the night in question.
On January 29, 1997, the Pickaway County Grand Jury returned an indictment charging appellant and Ricky Dunn with aggravated burglary in violation of R.C. 2911.11, kidnapping in violation of R.C. 2905.01, felonious assault in violation of R.C.2903.11, rape in violation of R.C. 2907.02, and theft in violation of R.C. 2913.02.
On April 10, 1997, appellant filed a motion to suppress all evidence obtained as a result of the search of appellant's residence and all statements made by appellant and his wife.
On April 14, 1997, appellant filed a notice of withdrawal of his April 10, 1997 motion to suppress evidence. Appellant stated that he did not wish to pursue the suppression motion because he did not want to waive his speedy trial rights.
On April 16, 1997, the state filed a motion requesting the court to charge the time between April 10, 1997 (the date of filing of appellant's motion to suppress evidence), and April 14, 1997 (the date appellant withdrew the motion) against appellant for speedy trial calculation. The state asserted that pursuant to R.C. 2945.72, the time between April 10 and April 14 is a period of delay necessitated by reason of a motion made by the accused, and, thus, the time is chargeable against appellant. On April 16, 1997, the trial court ordered the four day period to be charged against appellant.
On April 28, 1997, appellant filed a motion to dismiss the indictment. Appellant claimed that the state had failed to bring him to trial within the time set forth in R.C. 2945.71
and, thus, violated appellant's statutory right to a speedy trial. At the April 28, 1997 hearing regarding appellant's motion to dismiss, appellant noted that he was arrested on January 26, 1997, and, being unable to post bond, remained in jail. Therefore, appellant asserted that pursuant to the speedy trial statute, the state must have brought appellant to trial by April 25, 1997.
The state argued that no speedy trial violation occurred. The state noted that the ninetieth day, April 26, 1997, fell on a Saturday. Thus, the state asserted that because the ninetieth day was a Saturday, the April 28, 1997 trial date fell within the statutory speedy trial time. The trial court agreed with the state and overruled appellant's motion to dismiss.
On June 2, 1997, the trial court held a jury trial. In addition to the evidence and testimony related above, the state presented the following testimony and evidence.
John Miller, sales manager at Kehl Chevrolet, testified that appellant came to the dealership at approximately 2:00 p.m. on January 18, 1997. Appellant wanted to trade in his truck for a different car. Miller and appellant were talking and appellant told Miller that appellant "was at the wrong place at the wrong time." Appellant stated to Miller that Dunn was in trouble or that the person he was with the previous night was in trouble.
Margaret Saupe, a BCI forensic scientist, testified about her findings on the rape kit evidence that Dr. Frazier collected, on the victim's articles of clothing, and on appellant's articles of clothing. She first examined the rape kit evidence. The rape kit evidence consisted of a number of swabs from the victim's mouth, vagina, rectal area, skin, and underwear. Saupe analyzed all of the swabs to determine whether semen was present. Saupe also examined the victim's clothes for the presence of semen or hairs.
Saupe found semen present on the vaginal and rectal swabs, and on a dried secretion swabbing from the rape kit. Saupe also found semen on the pair of underwear Jillian had put on after the rape. Additionally, Saupe found a semen stain on the outside of appellant's dark colored sweatshirt.
Saupe examined appellant's pubic hair standard. Appellant's pubic hair standard, consisting of approximately fifteen to twenty pubic hairs, was reddish blond in color with the exception of one hair, which was darker. The one darker hair, Saupe testified, was more consistent with Jillian' s hair than with appellant's hair. Saupe sent the evidence to the Columbus Crime Lab ("CCL") for DNA testing.
Raman Tejwani, a DNA analyst with the Columbus Crime Lab, testified about the blood samples taken from Dunn, appellant, and Jillian, Jillian' s swabs and underwear, and appellant's semen stained sweatshirt. When Tejwani analyzed the swabs and the underwear, she determined that the semen came from more than one male contributor, but she was not able to exclude or include appellant as a contributor. Tejwani also stated that her analysis of the semen stained sweatshirt was inconclusive because the sample did not contain enough DNA.
In his defense, appellant presented the testimony of Larry M. Dehus, a forensic scientist. Dehus testified that he examined Hatton's pubic hair sample and, like Saupe, discovered a foreign pubic hair. Dehus stated that he microscopically compared the foreign pubic hair to Jillian's pubic hair and, unlike Saupe, concluded that the two were dissimilar. Dehus further stated that Saupe's report did not account for the black pubic hair that Dr. Frazier discovered. Dehus stated that an examination of the black pubic hair could have determined whether the hair was similar to Jillian's, or whether the hair was similar to either Hatton or Dunn. Dehus also stated that from reviewing CCL's DNA analysis reports, it appeared to him that a third individual contributed to the semen samples.
On June 5, 1997, the jury returned guilty verdicts on each count of the indictment.
On July 29, 1997, the trial court adjudicated appellant a sexual predator and sentenced appellant to consecutive terms of imprisonment: (1) ten years imprisonment for the aggravated burglary offense; (2) ten years imprisonment for the kidnapping offense; (3) ten years imprisonment for the rape offense; (4) eight years imprisonment for the felonious assault offense; and (5) one year imprisonment for the theft offense.
On August 18, 1997, appellant filed a timely notice of appeal.
 I
In his first assignment of error, appellant asserts that he received ineffective assistance of counsel. Appellant advances several different arguments as to why trial counsel was ineffective: (1) counsel failed to file a motion for a change of venue; (2) counsel withdrew a motion to suppress; (3) counsel failed to object to the prosecutor's comments during voir dire concerning the presumption of innocence; (4) counsel failed to object to the prosecutor's comments during voir dire concerning appellant's right to remain silent; (5) counsel's cross-examination of Clark regarding the sweatshirt and the semen stain was "constructively and unnecessarily inculpatory" and counsel failed to object to hearsay; (6) counsel failed to object to the prosecutor's comments analogizing the burden of proof for a rape conviction to the burden of proof for a minor misdemeanor; (7) counsel failed to properly acquire and examine evidence and reports; (8) counsel failed to object to hearsay and to the prosecutor's leading of witnesses; (9) counsel failed to employ reasonable standards of trial strategy by (a) delaying the defense's opening statement until the state rested, (b) failing to object to the introduction of the state's "questionable and admittedly inconclusive exhibits, (c) failing to insist that appellant testify, (d) failing to move for a Crim.R. 29 judgment of acquittal, (e) failing to ensure side bar conferences were put in the record, (f) failing "to object to the prosecutor's obvious subterfuge in offering the testimony of John Miller," and (g) failing to move for a mistrial or a continuance upon the discovery of a the black pubic hair and of the "B" DNA gene. As we explain below, we find all of appellant's claims of ineffective assistance of counsel meritless.
 A Standard of Review
The Sixth Amendment right to counsel protects "the fundamental right to a fair trial." Strickland v. Washington
(1984), 466 U.S. 668, 684 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674. "A fair trial is one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." Id.,466 U.S. at 685, 104 S.Ct. at 2063, 80 L.Ed.2d 674. Thus, effective counsel is one who "plays the role necessary to ensure that the trial is fair," id., 466 U.S. at 685, 104 S.Ct. at 2063,80 L.Ed.2d 674, and "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."Id., 466 U.S. at 686, 104 S.Ct. at 2064, 80 L.Ed.2d 674.
To establish that defense counsel's conduct so undermined the functioning of the adversarial process, a defendant must establish: (1) that "counsel's performance was deficient"; and (2) that the "deficient performance prejudiced the defense."Id., 466 U.S. at 687, 104 S.Ct. at 2063, 80 L.Ed.2d 674. Counsel's performance is deficient if counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id.,466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d 674; see, also, State v.Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373 (stating that counsel's performance is deficient if counsel substantially violates one of his essential duties to his client); State v.Peeples (1994), 94 Ohio App.3d 34, 44, 640 N.E.2d 208, 215
(stating that counsel's performance is deficient if it "raise[s] compelling questions concerning the integrity of the adversarial process"). To prove that defense counsel's deficient performance prejudiced the defense, a defendant must establish "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 104 S.Ct. at 2063,80 L.Ed.2d 674; see, also, Bradley, supra; Peeples, supra (stating that prejudice exists if counsel's deficient performance "raises substantial questions about the reliability of the outcome of the trial").
When addressing an ineffective assistance of counsel claim, the reviewing court should not consider what, in hindsight, may have been a more appropriate course of action. See State v.Phillips (1995), 74 Ohio St.3d 72, 85, 656 N.E.2d 643, 658
(stating that a reviewing court must assess the reasonableness of the defense counsel's decisions at the time they are made). Rather, the reviewing court "must be highly deferential."Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d 674. As the Strickland Court stated, a reviewing court:
 "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' "
Id., 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d 674; see, also, State v. Sallie (1998), 81 Ohio St.3d 673, 674,693 N.E.2d 267, 269; State v. Carter (1995), 72 Ohio St.3d 545,558, 651 N.E.2d 965, 977.
 B Motion for Change of Venue
To support his argument that he received ineffective assistance of counsel, appellant first asserts that counsel was ineffective for failing to file a motion for a change of venue. Appellant asserts that filing a motion for a change of venue "would have been reasonable in consideration of the publicity afforded the vile nature of the crime in a very small and rural community." We disagree with appellant's argument that trial counsel was ineffective for failing to file a motion for a change of venue.
First, we do not believe that appellant has demonstrated that counsel's performance was deficient. Appellant has not overcome the strong presumption that trial counsel's decision not to file a motion for a change of venue constituted sound trial strategy. Second, assuming, arguendo, that trial counsel's decision not to file a motion for a change of venue constituted deficient performance, as explained below, we do not believe that the deficient performance prejudiced the defense.
"[W]hen it appears that a fair and impartial trial cannot be held in the court in which the action is pending," a criminal defendant may request the trial court to transfer the action to an appropriate tribunal. See Crim.R. 18(B). The decision to change venue is a matter committed to the sound discretion of the trial court. State v. Gumm (1995), 73 Ohio St.3d 413, 430,653 N.E.2d 253, 269; State v. Fox (1994), 69 Ohio St.3d 183,189, 631 N.E.2d 124, 129-30.
The Ohio Supreme Court has long recognized that a searching voir dire provides the best test to determine whether a pool of prospective jurors is prejudiced against a criminal defendant. As the court stated in State v. Swiger (1966), 5 Ohio St.2d 151, 214 N.E.2d 417, paragraph two of the syllabus:
 "The examination of jurors on their voir dire affords the best test as to whether prejudice exists in the community against the defendant, and where it appears that opinions as to the guilt of the defendant of those called for examination for jurors are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue, in absence of a clear showing of an abuse of discretion."
See, also, Gumm, 73 Ohio St.3d at 430, 653 N.E.2d at 269; Fox,69 Ohio St.3d at 189, 631 N.E.2d at 130; State v. Montgomery
(1991), 61 Ohio St.3d 410, 413, 575 N.E.2d 167, 170-71. Moreover, the court has reminded trial courts that "the interests of judicial economy, convenience, and reduction of public expenses necessitate that judges make a good faith effort to seat a jury before granting a change in venue." Fox,69 Ohio St.3d at 189, 631 N.E.2d at 130.
Furthermore, we note that " 'pretrial publicity — even pervasive, adverse publicity — does not inevitably lead to an unfair trial.' " State v. Lundgren, 73 Ohio St.3d 474, 479,653 N.E.2d 304, 313 (quoting Nebraska Press Assn. v. Stewart
(1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 2800,49 L.Ed.2d 694-95). The fact of pretrial publicity is not enough, alone, to warrant a change of venue. Johnson v. Nix (C.A. 8, 1985),763 F.2d 344; United States v. McNally (C.A. 8, 1973),485 F.2d 398, 403, cert. denied (1974), 415 U.S. 978, 94 S.Ct. 1566,39 L.Ed.2d 874; Lundgren; State v. Maurer (1984), 15 Ohio St.3d 239, 473 N.E.2d 768; State v. Nobles (1995), 106 Ohio App.3d 246, 665 N.E.2d 1137.
In the case at bar, appellant's trial counsel and the court inquired into whether any of the prospective jurors had heard any information about the case through the news media. The court asked each prospective juror who had heard outside information whether he or she had formed an opinion as to appellant's guilt. Additionally, appellant's trial counsel questioned the prospective jurors whether pretrial publicity had influenced their opinion as to appellant's guilt or innocence. The trial court excused any prospective juror who stated that the pretrial publicity had influenced his ability to sit as a fair and impartial juror.
Our review of the voir dire transcript reveals that the trial court impaneled a fair and impartial jury. None of the impaneled jurors stated that extensive pretrial publicity had impacted his or her ability to sit as a fair and impartial juror. Furthermore, appellant's trial counsel expressed his satisfaction with the impaneled jury. See, generally,Maurer, 15 Ohio St.3d at 252, 473 N.E.2d at 782 (stating that a defendant who expresses satisfaction with an impaneled jury may not later claim that he did not receive a fair and impartial jury); State v. Booher (1988), 54 Ohio App.3d 1,560 N.E.2d 786; State v. William (Mar. 18, 1996), Meigs App. No. 94 CA 9, unreported.
Thus, assuming, arguendo, that appellant's trial counsel's failure to file a motion for a change of venue constituted deficient performance, we fail to see how trial counsel's deficient performance prejudiced the defense. Appellant's assertion that filing a motion for a change of venue "would have been reasonable" is insufficient to demonstrate that trial counsel's allegedly deficient performance prejudiced the defense.
 C Motion to Suppress
Second, appellant argues that trial counsel was ineffective for withdrawing a previously filed motion to suppress. Appellant claims that if counsel had not withdrawn the motion to suppress, testimony at the suppression hearing would have shown that all evidence seized as a result of the search of appellant's home would have been suppressed. In particular, appellant claims that the sweatshirt and its attendant stain would have been suppressed and that Saupes' report concerning the pubic hair would have been suppressed.
In State v. Dotson (Mar. 27, 1998), Pickaway App. No. 97 CA 9, unreported, we discussed when a failure to file a motion to suppress evidence may constitute ineffective assistance of counsel:
 "The Sixth Amendment's guarantee of assistance of counsel does not require trial counsel to file a motion to suppress in every case. State v. Flors
(1987), 38 Ohio App.3d 133, 528 N.E.2d 950, citing Kimmelman v. Morrison (1986), 477 U.S. 365, 91 L.Ed.2d 305, 106 S.Ct. 2574. The burden is on the defendant-appellant to point to evidence in the record supporting suppression of evidence. 'Where the record contains no evidence which would justify the filing of a motion to suppress, the appellant has not met his burden of proving that his attorney violated an essential duty by failing to file the motion.' State v. Gibson (1980), 69 Ohio App.2d 91, 95, 430 N.E.2d 954.
 A failure to file a motion to suppress may constitute ineffective assistance of counsel where there is a solid possibility that the court would have suppressed the evidence. State v. Garrett
(1991), 76 Ohio App.3d 57, 600 N.E.2d 1130. However, even when some evidence in the record supports a motion to suppress, we presume that defense counsel was effective if 'the defense counsel could reasonably have decided that the filing of a motion to suppress would have been a futile act.' State v. Edwards, (July 11, 1996), Cuyahoga Co. App. No. 69077, unreported, citing State v. Martin (1983), 20 Ohio App.3d 172, 485 N.E.2d 717. See, also, Strickland, supra, at 689."
Thus, in the case at bar, to determine whether counsel was ineffective for withdrawing the motion to suppress evidence, we must evaluate whether the record demonstrates a "solid possibility that the [trial] court would have suppressed the evidence," if trial counsel had not withdrawn the motion.
In his April 10, 1997 motion to suppress evidence, appellant asserted that the law enforcement officers violated the rule set forth in Miranda v. Arizona (1966), 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694, that law enforcement officers cease questioning the accused once the accused invokes his right to counsel. Appellant claimed that he invoked his right to counsel, yet the law enforcement officers continued to question him. Appellant therefore asserted that the trial court should have suppressed all evidence obtained as a result of the illegal interrogation. As explained below, we do not believe that the law enforcement officers violated the Miranda rule. Thus, we do not believe that a strong probability exists that the trial court would have suppressed the evidence.
The rule set forth in Miranda v. Arizona (1966),384 U.S. 436, 478, 86 S.Ct. 1602, 1611, 16 L.Ed.2d 694, protects an individual who "is taken into custody or otherwise deprived of his freedom by the authorities in any significant way" from jeopardizing his Fifth Amendment privilege against self-incrimination. Specifically, the Miranda rule provides:
 "* * * The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."
Id., 384 U.S. at 444, 86 S.Ct. at 1611, 16 L.Ed.2d 694. We note that the Miranda rule does not protect every person who is subjected to police questioning; the rule protects only individuals subjected to "custodial interrogation."
Miranda defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id., 384 U.S. at 444,86 S.Ct. at 1611, 16 L.Ed.2d 694; see, also, Stansbury v. California
(1994), 511 U.S. 318, 322, 114 S.Ct. 1526, 1528,128 L.Ed.2d 293; Oregon v. Mathiason (1977), 429 U.S. 492, 495,97 S.Ct. 711, 714, 50 L.Ed.2d 714 (stating that the Miranda protection attaches "only where there has been such a restriction on a person's freedom as to render him in 'custody' ").
Before law enforcement officers may subject an individual in "custody" to "interrogation," the person in custody:
 "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to questioning if he so desires."
Miranda, 384 U.S. at 479, 86 S.Ct. at 1630, 16 L.Ed.2d 694.
In determining whether Miranda's protections apply to an individual subjected to police questioning, the reviewing court initially must ascertain whether the individual was "in custody." If the individual was not "in custody," there can be no "custodial interrogation," and, thus, Miranda's protections do not attach.
The question of whether an individual is "in custody" is a mixed question of law and fact entitled to independent review. See Thompson v. Keohane (1995), 516 U.S. 99, 116 S.Ct. 457,460, 133 L.Ed.2d 383. In deciding whether the individual was in custody, the reviewing court focuses "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury, 511 U.S. at 323,114 S.Ct. at 1529, 128 L.Ed.2d 293; see Berkemer v. McCarty (1984),468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (stating that the relevant inquiry is how a reasonable person in the individual's position would have understood the situation). The reviewing court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler (1983), 463 U.S. 1121, 1125,103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (quoting Mathiason,429 U.S. at 495, 97 S.Ct. at 714, 50 L.Ed.2d 714). A formal arrest, or its functional equivalent, exists if it appears that a reasonable person would have "no choice but to submit to the officers' will and to confess." Minnesota v. Murphy (1984),465 U.S. 420, 433, 104 S.Ct. 1136, 1145, 79 L.Ed.2d 409. Additionally, "[t]he mere fact that an investigation has focused on a suspect does not trigger the need for Miranda
warnings in noncustodial settings." Id., 465 U.S. at 431,104 S.Ct. at 1144, 79 L.Ed.2d 409.
Employing the above standard, we cannot find that appellant was "in custody." Accordingly, no Miranda violation could have occurred, and the trial court would not have been required to grant appellant's motion to suppress.
Testimony at trial demonstrates that law enforcement officers went to appellant's home, advised appellant of hisMiranda rights, and asked appellant questions concerning his involvement in the crimes. Appellant expressed a desire to cooperate with the law enforcement officers and to help clear his name. When the law enforcement officers arrived at appellant's home, they did not arrest appellant or otherwise restrain his movement. The law enforcement officers did not handcuff or physically restrain appellant. Rather, appellant agreed to go to the police station, agreed to a line-up, and agreed to talk with law enforcement officers. The record demonstrates that after talking with law enforcement officers, appellant was free to leave. See, generally, Beheler, supra, (stating that a person is not in custody if "the suspect is not placed under arrest, voluntarily comes to the police station, and is allowed to leave unhindered by police after a brief interview"); Mathiason, supra, (stating that an individual is not in custody if he voluntarily appeared for questioning and was free to leave afterward).
We further note that merely advising an individual of hisMiranda rights does not necessarily imply "custodial interrogation." As we previously have stated, "Miranda warnings do not transform a non-custodial [interrogation] into a custodial interrogation." State v. Simpson (Feb. 21, 1992) Ross App. No. 1706, unreported; see, also, United States v. Charles
(C.A.5, 1984), 738 F.2d 686, 693; United States v. Lewis
(C.A.6, 1977), 556 F.2d 449; State v. Metz (Apr. 21, 1998), Washington App. No. 96 CA 48, unreported; State v. Fennell
(April 21, 1988), Athens App. No. 1354, unreported.
Appellant also appears to assert that although he gave the law enforcement officers consent to search his home and collect various bodily fluid samples, appellant's statement that he wanted to speak with his attorney negated the consent.
While the Fourth Amendment to the United States Constitution prohibits searches conducted without a warrant, an individual may consent to a warrantless search. See Schneckloth v.Bustamonte (1973), 412 U.S. 218, 219, 93 S.Ct. 2041, 2043,36 L.Ed.2d 854. Consent to a warrantless search operates as a waiver of the individual's Fourth Amendment right to be free from unreasonable searches and seizures. Consequently, by consenting to a warrantless search, the individual waives any right to object to the introduction of items seized as a result of the warrantless search. State v. Myers (1997), 119 Ohio App.3d 376, 695 N.E.2d 327; State v. Seymour (Nov. 9, 1993), Pickaway App. No. 90 CA 38, unreported (citing Frye v.United States (C.A.9, 1963), 315 F.2d 491).
In State v. Childress (1983), 4 Ohio St.3d 217,448 N.E.2d 155, certiorari denied (1983), 464 U.S. 853, 104 S.Ct. 167,78 L.Ed.2d 152, paragraph one of the syllabus, the Ohio Supreme Court described the prerequisites for a valid waiver of an individual's Fourth Amendment rights: "In order to waive hisFourth Amendment privilege against unreasonable searches and seizures, the accused must give a consent which is voluntary under the totality of all the surrounding circumstances." TheChildress court further noted that "[i]t is permissible for law enforcement officials to seek a waiver of the accused'sFourth Amendment rights even after he has invoked his right to counsel." Id., at paragraph two of the syllabus; see, also,State v. Rutter (1990), 68 Ohio App.3d 638, 641,589 N.E.2d 421, 423 (finding that consent to search voluntarily given even though defendant indicated that he wanted to speak with his attorney); State v. Tinch (1992), 84 Ohio App.3d 111, 121,616 N.E.2d 529, 535 (holding that defendant voluntarily consented to search even though two days earlier defendant had invoked his right to counsel). We note that in determining whether the accused voluntarily consented to the search, "the dispositive question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain consent."State v. Clelland (1992), 83 Ohio App.3d 474, 481,615 N.E.2d 276, 281 (citing United States v. Jones (C.A. 5, 1973),475 F.2d 723, 730).
In the case sub judice, we believe that appellant voluntarily consented to the search of his residence and that appellant voluntarily consented to giving hair and blood samples, despite his statement that he wished to speak with an attorney. The trial transcript reveals that law enforcement officers wished to talk with appellant. Appellant indicated that he did not want to talk with the officers and that he wanted an attorney. In response to the officers comments on the discrepancies between the evidence and appellant's story, appellant stated that he wished to clear his name. Appellant asked the officers what he could do to clear his name and indicated that he wanted to cooperate with the officers. The officers reminded appellant that he had requested an attorney and informed appellant that they would need to search appellant's residence and obtain hair and blood samples. Appellant stated that he would allow the officers to search his home and signed a consent to search form. Appellant also indicated that he was willing to provide the hair and blood samples. No evidence exists in the record that the officers employed coercive tactics in obtaining appellant's consent. Consequently, considering the totality of the circumstances, we conclude that appellant voluntarily consented to the search.
Accordingly, we do not believe that trial counsel was ineffective for withdrawing the motion to suppress evidence. We do not believe a strong possibility exists that the trial court would have granted the motion. See Dotson, supra. Trial counsel reasonably could have concluded that pursuing the motion to suppress would be futile. Furthermore, we note that trial counsel withdrew the motion upon appellant's statement that he did not wish to waive his right to a speedy trial.
 D Prosecutorial Misconduct
Appellant's third, fourth, and sixth claims of ineffective assistance of counsel challenge trial counsel's failure to object to the prosecutor's alleged misconduct during voir dire. Appellant argues that the prosecutor improperly attacked the presumption of innocence during voir dire by remarking as follows: "But just because the defendant pleads not guilty and we are here for a trial does not mean that the defendant is not guilty." The prosecutor then questioned the prospective jurors whether they agreed with the foregoing remark. Appellant also asserts that trial counsel was ineffective for failing to object to the prosecutor's "incessant and subtle references to Defendant's right to remain silent." Appellant refers to the following statements: (1) "Now you understand the defendant has the right not to testify. I cannot call the defendant as a witness. Do you each understand that? And if he chooses not to testify, you cannot consider that for any purpose in your deliberations"; and (2) "I cannot force the defendant to take the witness stand."[2] Additionally, appellant claims that trial counsel was ineffective for failing to object to the prosecutor's constant analogizing of his burden of proof on rape, kidnapping, etc., to the burden of proof in a minor misdemeanor. We disagree with appellant that trial counsel was ineffective for failing to object to the prosecutor's statements.
In State v. Fritz (May 26, 1998), Lawrence App. No. 97 CA 30, unreported, we described the test for determining whether a prosecutor's statements constitute misconduct as follows:
 "The test for prosecutorial misconduct is whether the prosecutor's remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused. State v. Moore
(1998), 81 Ohio St.3d 22, 33, 689 N.E.2d 1, citing State v. Smith (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. To establish prejudice, an accused must show that there is a reasonable probability that, but for the prosecutor's improper remarks, the result of the proceeding would have been different. State v. Loza (1994), 71 Ohio St.3d 61, 83, 641 N.E.2d 1082, certiorari denied (1995), 514 U.S. 1120, 131 L.Ed.2d 871, 115 S.Ct. 1983."
We further note that failure to object to prosecutorial misconduct "does not constitute ineffective assistance of counsel per se, as that failure may be justified as a tactical decision." State v. Gumm (1995), 73 Ohio St.3d 413, 428,653 N.E.2d 253, 267. Moreover, assuming, arguendo, that trial counsel's failure to object constitutes deficient performance, an appellant still must demonstrate that counsel's failure to object prejudiced his defense. State v. Reynolds (1998),80 Ohio St.3d 670, 679, 687 N.E.2d 1358.
In his first two instances of alleged ineffective assistance of counsel relating to prosecutorial misconduct, appellant contends that the prosecutor committed misconduct during voir dire by impermissibly commenting on appellant's constitutional right against self-incrimination.
In Griffin v. California (1965), 380 U.S. 609, 615,85 S.Ct. 1229, 1233, 14 L.Ed.2d 106, the United States Supreme Court held that the Fifth Amendment's protection against self-incrimination "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." The Court subsequently clarified its Griffin holding, stating that the Fifth Amendment prohibits either the prosecution or the court from adversely commenting upon the accused's silence. Lakeside v. Oregon (1978),435 U.S. 333, 338-39, 98 S.Ct. 1091, 1093, 55 L.Ed.2d 319. The Lakeside
decision indicates that judicial or prosecutorial commentary concerning the accused's Fifth Amendment privilege against self-incrimination does not constitute a constitutional violation unless the comments are intended to imply that the accused's silence is evidence of guilt. See id.; State v. Neal
(Jan. 23, 1996), Franklin App. No. 95APA05-542, unreported (quoting State v. Ransom (July 10, 1980), Franklin App. No. 79AP-755, unreported (stating that "[t]he comment is adverse when it may lead the jury to think that the defendant's failure to testify is an indication of guilt")). As the court explained in State v. Thompson (1987), 33 Ohio St.3d 1, 4,514 N.E.2d 407, 411-12:
 "Comments by prosecutors on the post-arrest silence or refusal to testify by defendants have always been looked upon with extreme disfavor because they raise an inference of guilt from a defendant's decision to remain silent. In effect, such comments penalize a defendant for choosing to exercise a constitutional right. Prosecutors must therefore take care not to equate the defendant's silence to guilt. See State v. Rogers (1987), 32 Ohio St.3d 70, 512 N.E.2d 581. Further, they must be aware that where such comments work to the material prejudice of the defendant, they will not be tolerated. See, e.g., Wainwright v. Greenfield
(1986), 474 U.S. 284; Doyle v. Ohio (1976), 426 U.S. 610."
Moreover, a reviewing court may affirm a defendant's conviction provided that the comments regarding the defendant's silence are harmless beyond a reasonable doubt. State v. McClellan
(1994), 93 Ohio App.3d 315, 324, 638 N.E.2d 593, 599; see, also, United States v. Hasting (1983), 461 U.S. 499,103 S.Ct. 1974, 76 L.Ed.2d 96.
In United States v. Connally (C.A. 6, Jan. 15, 1993), Nos. 91-6401, 6440, 6441, unreported, the defendant challenged the following prosecutorial comments:
 "Now, the Defendants in this case have a constitutional right to testify if they want to. I can't stop them, the Judge can't stop them. Nobody can stop them from testifying if they want to.
 By the same token, though, they have a constitutional right not to testify and you can't hold it against them if they don't."
The court found that the prosecutor's comments did not prejudice the defendants. The court further noted that the comments correctly stated the law and that "considering that [the comments] were made during voir dire, the prosecutor was not commenting on the defendants' failure to testify."
In the case at bar, we do not believe that the prosecutor's comments during voir dire relating to appellant's right not to testify were improper. The prosecutor did not adversely comment on appellant's failure to testify during voir dire. The prosecutor's comments did not imply that appellant's silence should be construed as evidence of his guilt. Furthermore, similar to the comments in Connally, the prosecutor's comments were correct statements of the law.
In his third instance of alleged ineffective assistance of counsel relating to prosecutorial misconduct, appellant contends that the prosecutor committed misconduct throughout the proceedings below by stating that the burden of proof in a felony case is no greater than the burden of proof in a misdemeanor case.
Initially, we note that appellant has cited no authority to support his argument. Furthermore, we have found no Ohio cases suggesting that it is improper for a prosecutor to state that the burden of proof in a felony case is no higher than the burden of proof in a misdemeanor case. Moreover, assuming,arguendo, that the prosecutor's comments relating to the burden of proof were improper, we fail to see how the prosecutor's comments prejudiced appellant's defense. Appellant has not demonstrated that the result of the trial would have been different in the absence of the prosecutor's statements. Thus, we fail to see how trial counsel's failure to object to the prosecutor's statement prejudiced the defense.
 E Strategical Decisions
Appellant's fifth, seventh, eighth, and ninth claims of ineffective assistance of counsel involve alleged errors that we believe are properly classified as strategical decisions.
In his fifth claim, appellant asserts that trial counsel was ineffective during the cross-examination of Officer Clark. Appellant claims that the cross-examination was constructively and unnecessarily inculpatory.
In his seventh claim, appellant argues that trial counsel was ineffective for failing to properly acquire and examine all available evidence and reports. For example, appellant claims: (1) that trial counsel did not examine or further investigate the bed linens from the victim's bedroom where appellant allegedly raped the victim; (2) that trial counsel either had not seen the BCI report or grossly misunderstood the report; (3) that counsel either did not have a copy of the BCI report or was unfamiliar with the report; (4) that counsel's examination of Dehus indicates that he did not review Saupes' report prior to her testimony or negligently did not use it for purposes of cross; (5) that Dehus' development of a flaw in the pubic hair testing was done the Monday immediately prior to trial; (6) that counsel's cross of Tejwani indicates he had not seen her notes, whether through his negligence or prosecutor's misconduct in discovery.
In his eighth claim, appellant argues that trial counsel continually failed to object to hearsay and to the prosecutor's continued leading of witnesses regarding damaging parts of testimony.
In his ninth claim, appellant asserts that counsel tactically failed at nearly every level and stage of reasonable courtroom conduct by: (1) delaying opening statement until plaintiff rested and jury had likely formed all their opinions and then provided a deplorably weak and uninformative statement of one to two minutes duration; (2) failing to object to introduction of any of the state's questionable and admittedly inconclusive exhibits; (3) failing to insist that appellant testify "in a case which demanded his routine denial before the jury of a crime of this vileness"; (4) failing to move for a judgment of acquittal; (5) failing to ensure side bar conferences were recorded; (6) failing to object to the prosecutor's "obvious subterfuge" in offering the testimony of John Miller; (7) failing to move for a mistrial or continuance upon the discovery of a fourth type of pubic hair and upon the discovery of the "B" DNA gene.
We note that effective assistance of counsel does not equate with a winning defense strategy. Debatable trial tactics do not necessarily constitute a violation of defense counsel's duties.State v. Clayton (1980), 62 Ohio St.2d 45, 49, 402 N.E.2d 1189,1192. Counsel is not ineffective simply because a better trial strategy may have been available. Clayton, supra. A defendant must demonstrate that defense counsel's trial tactics prejudiced him, not merely speculate that trial counsel's allegedly deficient performance prejudiced the defense. SeeState v. Bradley (1989), 42 Ohio St.3d 136, 143,538 N.E.2d 373.
We do not believe that appellant has overcome the strong presumption that counsel's decisions with respect to the foregoing claims constituted reasonable trial strategy. Furthermore, appellant has not sufficiently demonstrated how the allegedly deficient performance prejudiced his defense. At most, appellant's claims of ineffective assistance of counsel merely speculate that the result of the trial could have been different if counsel's performance had not been deficient. Furthermore, we believe that appellant's arguments essentially constitute the hindsight review of counsel's conduct that both the United States and the Ohio Supreme Courts have cautioned against. See Strickland, supra; Phillips, supra; see, also,State v. Keenan (1998), 81 Ohio St.3d 133, 153, 689 N.E.2d 929,947 (stating that a defendant's ineffective assistance claims may lack merit when the defendant "barely tries even to show deficient performance or resulting prejudice; instead, he makes shotgun claims * * *").
In conclusion, we find no merit to appellant's claims of ineffective assistance of counsel. Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.
 II
In his second assignment of error, appellant asserts that the prosecutor's misconduct throughout the trial, in conjunction with the "judicial misconduct of passivity or permissiveness," deprived appellant of a fair trial. Appellant alleges the following instances of prosecutorial misconduct: (1) the prosecutor impermissibly attacked the presumption of innocence; (2) the prosecutor implies appellant is a liar by questionably referring to appellant's Fifth Amendment right to remain silent and by commenting on appellant's conflicting statements and credibility; (3) the prosecutor compared the burden of proof on kidnapping, rape, etc., to a minor misdemeanor, "which though technically correct, when placed in the improper argumentative forum and then hammered repeatedly, demeans the magnitude and the gravity of the jurors' collective task"; (4) "[t]he prosecutor's introduction of the witness John Miller was a bald and material misstatement of fact, insofar as it was intended as a statement against interest or quasi-confession by appellant, when, in fact, the prosecutor was aware it was innocuous under all the circumstances."
Appellant also argues that the trial court engaged in judicial misconduct by permitting the prosecutor's alleged misconduct. Appellant asserts that "[a] diffident or detached presence by the court is inconsistent with due process and a fair trial in an arena atmosphere pitting an arguably overzealous prosecutor and an arguably incompetent/weak defense counsel." Appellant also contends that the trial court, "in the face of continuous prosecutorial misconduct coupled with the blatantly ineffective assistance of counsel consistently breached" its " 'duty to control all proceedings during the trial in order to prevent bias or prejudice against the accused or a denial to him of a fair trial.' "
In State v. Keenan (1993), 66 Ohio St.3d 402, 406,613 N.E.2d 203, 207, the Ohio Supreme Court discussed claims of prosecutorial misconduct as follows:
 "The prosecutor carries into court the prestige of 'the representative * * * of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest is not that it shall win a case, but that justice shall be done. * * * Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.' Berger v. United States (1935), 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314."
In evaluating claims of prosecutorial misconduct, a reviewing court "must remember that 'the touchstone of analysis "* * * is the fairness of the trial, not the culpability of the prosecutor." * * * The Constitution does not guarantee an "error free, perfect trial." ' " State v. Hall (Aug. 3, 1994), Montgomery App. No. 13805, unreported (quoting State v. Landrum
(1990), 53 Ohio St.3d 107, 112, 559 N.E.2d 710, 718).
Appellant first asserts that the prosecutor committed misconduct by commenting as follows:
 "Now the judge will explain to you that just because an indictment is returned against an individual for certain charges, that does not mean that the defendant is guilty. But just because the defendant pleads not guilty and we are here for a trial does not mean that the defendant is not guilty. * * *."
Appellant contends that the prosecutor's comment impermissibly attacked the presumption of innocence afforded a criminal defendant and, thus, amounted to prosecutorial misconduct.
The state asserts that the prosecutor's comments correctly stated the law and were intended to assure that the prospective jurors understood the presumption of innocence.
We do not believe that the prosecutor's comments were improper or that the comments prejudiced appellant's defense. Rather, we agree with the state that the prosecutor's comments were correct statements of the law and served to ensure that the prospective jurors understood the law. We do not believe that the prosecutor's comments amounted to misconduct. As the court stated in State v. Bridgeman (1977), 51 Ohio App.2d 105,110, 366 N.E.2d 1378, 1383.
 "While it is solely the responsibility of the trial judge to give the law that governs the trial, such responsibility does not preclude counsel from questioning the panel on matters of applicable law so long as counsel states the law fairly and accurately, and couches it in language that makes it clear that the court is the final arbiter of the law. Counsel have a duty to select a jury that will not only properly decide the facts but apply the law given by the court to the facts as the jury finds them to be. Counsel may inquire of the panel whether it will hold the state to its burden of proving each element of the offense beyond a reasonable doubt, if the judge so instructs the panel. Such latitude is inherent in the rule that permits counsel to supplement the court's examination by further inquiry. To determine the bias, prejudice or partiality of the voir dire panel on the law and the facts is the duty of counsel no less than that of the court. Such inquiry of the panel should be sufficiently flexible to include matters of applicable law not reached by the court. Counsel should be permitted to probe into areas where the responses to the court's questions were incompletely or hesitantly given. The trial judge must allow for the selection of a jury that will evaluate the evidence presented by the parties and apply the law given by the court fairly and impartially."
With respect to appellant's remaining claims of prosecutorial misconduct, we note that appellant did not object to the instances of prosecutorial misconduct. Therefore, in the absence of plain error, appellant has waived any error.State v. Campbell (1994), 69 Ohio St.3d 38, 40-41; State v.Gotham (Dec. 31, 1997), Trumbull App. No. 96-T-5485. We may only reverse appellant's conviction if the complained of error affects one of appellant's substantial rights. Crim.R. 52(B);State v. Slagel (1992), 65 Ohio St.3d 59, 603, 605 N.E.2d 916,924-25; State v. Long (1978), 53 Ohio St.2d 91, 7 Ohio Op.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Furthermore, the Ohio Supreme Court has stated that Crim.R. 52(B) is to be invoked "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Landrum (1990), 53 Ohio St.3d 107,111, 559 N.E.2d 710, 717. Upon our review of the record, we find that the circumstances involved in the case at bar are not sufficiently exceptional to merit application of Crim.R. 52(B). Assuming, arguendo, that appellant had preserved the issue of prosecutorial misconduct for our review, we would find no error.
We note that we addressed appellant's second and third claims of prosecutorial misconduct in our discussion of appellant's first assignment of error. In our discussion of appellant's first assignment of error, we concluded that the prosecutor's comments regarding appellant's right not to testify and regarding the burden of proof did not amount to misconduct. We believe that our disposition of the claims asserted in appellant's first assignment of error fully disposes of appellant's second and third claims asserted in his second assignment of error, and we will need not re-address the issues.
We do not find any merit with appellant's fourth claim of prosecutorial misconduct. We believe, as appellee argues, that Miller's testimony was offered merely to corroborate the testimony of other witnesses. Miller's testimony that appellant visited the car dealership to discuss trading in his 1984 Chevrolet truck corroborated Dunn's testimony that appellant drove a Chevrolet truck on the night of the crime.
In light of our finding that no prosecutorial misconduct occurred, we cannot conclude that the trial court committed any misconduct by maintaining a "passive" presence.
Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.
 III
In his third assignment of error, appellant asserts that the state failed to disclose exculpatory evidence material to appellant's innocence and deprived him of a fair trial. Appellant claims that the black pubic hair "was clearly exculpatory and material to [a]ppellant's innocence." Appellant claims that neither he nor Dunn have black hair. Appellant also argues that the state failed to disclose the existence of the "B" DNA gene discovered in the semen sample taken from the victim. Appellant claims that "[t]his finding established beyond doubt that someone other than the victim, Dunn[,] or [a]ppellant contributed to the sample."
In State v. Heyward (May 18, 1998), Pickaway App. No. 96 CA 42, unreported, we discussed the state's alleged failure to disclose exculpatory evidence as follows:
 "Crim.R. 16(B) requires the prosecution to disclose certain evidence to a criminal defendant upon request. This evidence includes any statement of the defendant or a co-defendant, the defendant's prior record, documents and tangible objects, reports of examinations and tests, witness names and addresses and criminal records, and any evidence favorable to the defendant. See State ex rel. WHIO-TV-7 v. Lowe (1997), 77 Ohio St.3d 350, 353-354, 673 N.E.2d 1360; Crim.R. 16(B)(1)(a) through (f).
 When the prosecution withholds material, exculpatory evidence in a criminal proceeding, it violates the defendant's due process right to a fair trial under the Fourteenth Amendment. State v. Johnston (1988), 39 Ohio St.3d 48, 60, 529 N.E.2d 898. 'The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. (Brady v. Maryland [1962], 373 U.S. 83, 10 L.Ed.2d 215, 83 S.Ct. 1194, followed.)' Id. at paragraph four of the syllabus. 'In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense. (United States v. Bagley [1984], 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375, followed.)' Id. at paragraph five of the syllabus.
 A defendant is not, however, entitled to pretrial disclosure of all information that might be useful in contradicting favorable testimony. State v. Hesson (1996), 110 Ohio App.3d 845, 852, 675 N.E.2d 532, citing Pennsylvania v. Ritchie
(1987), 480 U.S. 39, 94 L.Ed.2d 40, 107 S.Ct. 989. 'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' State v. Jackson (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549."
Furthermore, we note that the materiality of suppressed evidence must be determined collectively rather than item-by-item. Kyles v. Whitley (1995), 514 U.S. 419, 436-437,131 L.Ed.2d 490, 115 S.Ct. 1555.
Employing the foregoing principles to the case sub judice, we conclude that the state did not fail to disclose exculpatory evidence to appellant.
We initially note that prior to trial, the state provided appellant with Saupe's report concerning the pubic hair sample and with the DNA test results. Neither Saupe's report nor the DNA report included information regarding the black pubic hair or the "B" DNA gene. Consequently, the state did not "withhold" exculpatory evidence.
Moreover, assuming, arguendo, that the state failed to timely disclose exculpatory evidence, appellant fails to demonstrate that the result of his trial would have been different had the state disclosed the evidence. We note that appellant's expert reviewed the reports. Appellant's expert testified that in his opinion, the black pubic hair and the "B" DNA gene indicated that a third individual contributed to the semen samples collected from the victim. Thus, unlike the typical Brady
violation when the jury does not have the opportunity to hear about the alleged exculpatory evidence, in the case at bar appellant presented the alleged exculpatory evidence to the jury.
Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 IV
In his fourth assignment of error, appellant asserts that his convictions are against the manifest weight of the evidence. According to appellant, the incontrovertible evidence implicating appellant includes: (1) the excited utterance of the uncorroborated accomplice accusing appellant; (2) third party confirmation of appellant being in the company of the accomplice less than two hours before the crimes; (3) appellant's statement to police that he was in accomplice's company before the crime. According to appellant, the exculpatory evidence includes: (1) the lineup on appearance or voice; (2) the "B" DNA gene; (3) the black pubic hair. According to appellant, the inconclusive evidence includes: (1) the lack of discernable fingerprints on the knife; (2) the rape kit evidence; (3) the pubic hair sample evidence; and (4) the semen on the sweatshirt.
When considering an appellant's claim that the conviction is against the manifest weight of the evidence, the reviewing court sits, essentially, as a " 'thirteenth juror' and [may] disagree[ ] with the fact finder's resolution of the conflicting testimony." State v. Thompkins (1997), 78 Ohio St.3d 380,387, 678 N.E.2d 531, 546-47 (quoting Tibbs v.Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 2218,72 L.Ed.2d 652, 661). The reviewing court must dutifully examine the entire record, weighing the evidence and considering the credibility of witnesses, while being mindful that credibility generally is an issue for the trier of fact to resolve. Statev. Thomas (1982), 70 Ohio St.2d 79, 80, 434 N.E.2d 1356, 1357;State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
Once the reviewing court has finished its examination, the court may reverse the judgment of conviction if it appears that the fact finder, in resolving conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " Thompkins, 78 Ohio St.3d at 387, 678 N.E.2d at 547 (quotingState v. Martin (1983), 20 Ohio App.3d 172, 175,485 N.E.2d 717, 720-21). If the state presented substantial evidence upon which the trier of fact reasonably could conclude, beyond a reasonable doubt, that the essential elements of the offense had been established, a reviewing court will not reverse the judgment of conviction as against the manifest weight of the evidence. State v. Eley (1978), 56 Ohio St.2d 169,383 N.E.2d 132, syllabus.
Upon our review of the entire record, we find that the trier of fact did not clearly lose its way and create a manifest miscarriage of justice. We find substantial evidence upon which the trier of fact reasonably could conclude that the state had established, beyond a reasonable doubt, the essential elements of the offenses.
R.C. 2911.11 sets forth the essential elements of the offense of aggravated burglary:
 (A) No person, by force, stealth, or deception, shall trespass in an occupied structure of in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
 (1) The offender inflicts, or attempts or threatens to inflict physical harm on another;
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
The state presented the following evidence to establish the essential elements of the offense: (1) Ricky Dunn's testimony that appellant trespassed upon the Chatham Drive residence, a separately occupied structure, with purpose to commit an offense inside the residence; and (2) the victim's testimony that appellant inflicted, or attempted to inflict, physical harm upon her, and that appellant had a deadly weapon, a knife, under his control. We do not believe that the trier of fact clearly lost its way in reviewing the evidence and in finding that appellant committed aggravated burglary.
R.C. 2905.01 sets forth the essential elements of kidnapping:
 (A) No person, by force, threat, or deception, * * by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
* * *
 (4) To engage in sexual activity * * * with the victim against the victim's will * * *.
The state presented the following evidence to establish the essential elements of the kidnapping offense. First, the victim testified that appellant entered her room, restrained her of her liberty by forcing himself on top of her, and engaged in sexual activity with her against her will. The victim also testified that appellant took her from her bedroom and forced her to go downstairs. We do not believe that the trier of fact created a manifest miscarriage of justice by convicting appellant of the kidnapping offense.
R.C. 2903.11 sets forth the essential elements of the offense of felonious assault:
(A) No person shall knowingly:
 (1) Cause serious physical harm to another * * *;
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance * * *.
The state presented the following evidence to establish the essential elements of the felonious assault offense. The victim testified that the man who raped her in her bedroom held a knife to her throat and threatened to kill everyone in the house if she screamed or made any noise. The state asserts that appellant's conduct of holding a deadly weapon to the victim's throat, along with an expressed intention to use it, constituted felonious assault. We believe that the manifest weight of the evidence supports appellant's felonious assault conviction.
R.C. 2907.02 sets forth the essential elements of the offense of rape:
 (A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
The state asserts that the following evidence established the essential elements of the offense of rape. Dunn's testimony placed appellant at the scene. The victim testified that the man forced her to submit to various sexual acts by getting on top of her, forcing a knife to her throat, and threatening her life and the lives of her family. The state also notes that the DNA evidence neither excluded nor included appellant as a perpetrator of the rape. We find that the manifest weight of the evidence supports appellant's rape conviction.
R.C. 2913.02 sets forth the essential elements of the offense of theft:
 (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 (1) Without the consent of the owner or person authorized to give consent * * *.
The state presented the following evidence to demonstrate the essential elements of the theft offense. Dunn testified that appellant was present at the Chatham drive residence. Dunn testified that appellant intended to steal items. Dunn testified that appellant stated that they were going to rob a house. Dunn testified that appellant opened the side garage door and looked through the cars. Dunn testified that appellant found a set of keys inside a car. Furthermore, the victim's testimony demonstrates that appellant had the opportunity to steal items after he raped her. The victim testified that appellant left and re-entered the living room more than once while Dunn was raping her. The victim's father testified that after the events occurred, he discovered that the following items were missing from his home: (1) his wife's wedding and engagement rings; (2) a watch; (3) two money clips; (4) a cam corder and case; (5) cash; and (6) a set of keys. The victim's father stated that the total value of the items totaled approximately eighteen hundred dollars. We do not believe that the trier of fact clearly lost its way and created a manifest miscarriage of justice.
We recognize appellant's concern that the majority of the evidence supporting his convictions is circumstantial. We note, however, that the elements of an offense may be established by direct evidence, circumstantial evidence, or both. SeeState v. Durr (1991), 58 Ohio St.3d 19, 514 N.E.2d 394. Furthermore, circumstantial and direct evidence are of equal evidentiary value. See State v. Jenks, 61 Ohio St.3d 272, 272,574 N.E.2d 492, 502 ("Circumstantial evidence and direct evidence inherently possess the same probative value [and] [i]n some instances certain facts can only be established by circumstantial evidence."). The state introduced ample circumstantial evidence to prove that appellant committed the crimes with which he was charged. Consequently, we find that the state presented substantial, credible evidence from which the trier of fact could reasonably conclude, beyond a reasonable doubt, that the essential elements of the offenses had been established.
 V
In his fifth assignment of error, appellant argues that the rape and felonious assault charges should have been merged and the theft charge dismissed. Appellant claims that the rape and felonious assault charges are allied offenses of similar import. Appellant also asserts that the theft charge should have been dismissed because "no evidence of any kind was adduced, submitted or otherwise mentioned, except in final argument, as to the theft of items." We disagree with appellant.
Initially, we disagree with appellant that the theft conviction should have been dismissed. As we discussed under appellant's fourth assignment of error, ample evidence exists in the record to support appellant's theft conviction.
Second, we note that appellant did not argue that the rape and felonious assault convictions are allied offenses of similar import for purposes of sentencing. Accordingly, absent plain error, appellant has waived the issue for purposes of appeal. State v. Campbell (1994), 69 Ohio St.3d 38, 40-41;State v. Gotham (Dec. 31, 1997), Trumbull App. No. 96-T-5485. As we stated above, we may only reverse the trial court's decision if the complained of error affects one of appellant's substantial rights. Crim.R. 52(B); State v. Slagel (1992),65 Ohio St.3d 59, 603, 605 N.E.2d 916, 924-25; State v. Long
(1978), 53 Ohio St.2d 91, 7 Ohio Op.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Furthermore, the Ohio Supreme Court has stated that Crim.R. 52(B) is to be invoked "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Landrum
(1990), 53 Ohio St.3d 107, 111, 559 N.E.2d 710, 717.
Upon our review of the record, we find that the circumstances involved in the case at bar are not sufficiently exceptional to merit application of Crim.R. 52(B). Assuming,arguendo, that appellant had preserved the issue for our review, we would find no error.
R.C. 2941.25 prohibits cumulative punishment for allied offenses of similar import. State v. Roberts (1980), 62 Ohio St.2d 170,172, 405 N.E.2d 247, 250. The statute seeks to protect a defendant from receiving multiple sentences for crimes that are motivated by the same purpose and that are premised upon identical conduct and similar evidence. State v.Brown (1982), 7 Ohio App.3d 113, 454 N.E.2d 596. The statute provides:
 (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of a same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
In determining whether two or more offenses are allied offenses of similar import, courts must apply the following two-tiered test:
 "Under R.C. 2941.25, a two-tiered test must be undertaken to determine whether two or more crimes are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses."
Newark v. Vazirani (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, syllabus.
Under the first tier of the Newark test, we do not believe that the elements of the offenses correspond to such a degree that the commission of one will result in the commission of the other. R.C. 2907.02 sets forth the elements of the rape offense:
 (A)(2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
R.C. 2903.11 sets forth the elements of the felonious assault offense:
(A) No person shall knowingly:
 (1) Cause serious physical harm to another * * *;
 (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance * * *.
The elements of rape and the elements of felonious assault do not overlap; each requires proof of facts not required to prove the other. See State v. Jones (1992), 83 Ohio App.3d 723, 739,615 N.E.2d 713, 724. An individual may commit rape without also committing felonious assault.
Having determined that the elements of the two offenses do not correspond to such a degree that the commission of one offense necessarily results in the commission of the other, we need not proceed to the second tier to resolve whether appellant committed the offenses separately or with a separate animus as to each. See Jones, supra; State v. Mughni (1987),33 Ohio St.3d 65, 68, 514 N.E.2d 870, 873; State v. Talley (1985),18 Ohio St.3d 152, 480 N.E.2d 439, syllabus.
Accordingly, based upon the foregoing reasons, we overrule appellant's fifth assignment of error.
 VI
In his sixth assignment of error, appellant asserts that he was denied his right to a speedy trial. Appellant argues that delays in providing evidence that he requested from the state resulted in continuances improperly charged to appellant.
Initially, we note that a trial court's decision regarding a motion to dismiss based upon a violation of the speedy trial provisions presents a mixed question of law and fact for our review. We accord due deference to the trial court's findings of fact if supported by competent, credible evidence. We will, however, independently review whether the trial court properly applied the law to the facts of the case. See, e.g., State v.Pilgrim (Jan. 28, 1998), Pickaway App. Nos. 97 CA 2 97 CA 4, unreported; State v. Woltz (Nov. 4, 1994), Ross App. No. 93CA1980, unreported.
The speedy trial provisions, R.C. 2945.71-.73, seek to enforce an accused's constitutional right to a speedy and public trial. State v. Pachay (1980), 64 Ohio St.2d 218,416 N.E.2d 589, syllabus. In City of Brecksville v. Cook (1996),75 Ohio St.3d 53, 55, 661 N.E.2d 706, 707, the court discussed an accused's right to a speedy trial as follows:
 "Ohio's speedy trial statute was implemented to incorporate the constitutional protection of the right to a speedy trial provided for in the Sixth Amendment to the United States Constitution and in Section 10, Article I, of the Ohio Constitution. State v. Broughton (1991), 62 Ohio St.3d 253, 256, 581 N.E.2d 541, 544; see Columbus v. Bonner (1981), 2 Ohio App.3d 34, 36, 2 Ohio B. Rep. 37, 39, 440 N.E.2d 606, 608. The constitutional guarantee of a speedy trial was originally considered necessary to prevent oppressive pretrial incarceration, to minimize the anxiety of the accused, and to limit the possibility that the defense will be impaired. State ex rel. Jones v. Cuyahoga Cty. Ct. of Common Pleas (1978), 55 Ohio St.2d 130, 131, 9 Ohio App.3d 108, 109, 378 N.E.2d 471, 472.
 Section 10, Article I of the Ohio Constitution guarantees to the party accused in any court 'a speedy public trial by an impartial jury.' 'Throughout the long history of litigation involving application of the speedy trial statutes, this court has repeatedly announced that the trial courts are to strictly enforce the legislative mandates evident in these statutes. This court's announced position of strict enforcement has been grounded in the conclusion that the speedy trial statutes implement the constitutional guarantee of a public speedy trial.' (Citations omitted.) State v. Pachay
(1980), 64 Ohio St.2d 218, 221, 416 N.E.2d 589, 591. We are acutely conscious of the magnitude of the rights we interpret today. We have also previously explained, however, that 'the prescribed times for trial set forth in R.C. 2945.71 are not absolute in all circumstances, but a certain measure of flexibility was intended by the General Assembly by the enactment of R.C. 2945.72, wherein discretionary authority is granted to extend the trial date beyond the R.C. 2945.71 time prescriptions."
In seeking to enforce an accused's constitutional right to a speedy trial, R.C. 2945.71(C)(2) requires the state to try a person charged with a felony within two hundred seventy days after his arrest. For purposes of computing the two hundred seventy day period, R.C. 2945.71(E) provides that each day an accused spends in jail awaiting trial on the pending charge counts as three days. The date of arrest is not counted in calculating the number of speedy trial days that have elapsed.State v. Lautenslagar (1996), 112 Ohio App.3d 108, 109-110,677 N.E.2d 1263; State v. McCornell (1993), 91 Ohio App.3d 141,145, 631 N.E.2d 1110, 1112; State v. Steiner (1991), 71 Ohio App.3d 249,250-251, 593 N.E.2d 368, 369.
Once an accused demonstrates that more than two hundred seventy days have elapsed between his initial arrest and the date of his trial, the accused establishes a prima facie case for dismissal. State v. Butcher (1986), 27 Ohio St.3d 28,30-31, 500 N.E.2d 1368, 1369-1370; State v. Baker (1993),92 Ohio App.3d 516, 525, 636 N.E.2d 363, 369; State v. Howard
(1992), 79 Ohio App.3d 705, 707, 607 N.E.2d 1121; State v.Geraldo (1983), 13 Ohio App.3d 27, 28, 468 N.E.2d 328. The burden then shifts to the state to produce evidence demonstrating that the accused was not entitled to be brought to trial within the two hundred seventy day period. Baker,92 Ohio App. 3d at 526, 636 N.E.2d at 369; Howard, supra; State v.Bowman (1987), 41 Ohio App.3d 318, 319, 535 N.E.2d 730.
R.C. 2945.72 sets forth the circumstances under which the two hundred seventy day period may be extended. R.C. 2945.72
provides:
 The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:
 (A) Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him, within or outside the state, by reason of his confinement in another state, or by reason of the pendency of extradition proceedings, provided that the prosecution exercises reasonable diligence to secure his availability;
 (B) Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;
 (C) Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;
 (D) Any period of delay occasioned by the neglect or improper act of the accused;
 (E) Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;
 (F) Any period of delay necessitated by a removal or change of venue pursuant to law;
 (G) Any period during which trial is stayed pursuant to an express statutory requirement, or pursuant to an order of another court competent to issue such order;
 (H) The period of any continuance granted on the accused's own motion and the period of any reasonable continuance granted other than upon the accused's own motion;
 (I) Any period during which an appeal filed pursuant to section 2945.67 of the Revised Code is pending.
(Emphasis added.)
If an accused is not brought to trial within the provisions of the speedy trial statutes, and if the R.C. 2945.72
exceptions do not apply, R.C. 2945.73 requires the court, upon motion prior to trial, to discharge the accused.
Upon our review of the record, we find that no violation of appellant's statutory speedy trial rights occurred. The trial court originally set the trial date for April 28, 1997. The April 28, 1997 trial date, as the trial court found, fell within the statutory speedy trial time. The June 3, 1997 trial date fell outside the statutory speedy trial time. The state, however, demonstrated that the R.C. 2945.72(H) exception applied and extended the statutory speedy trial time.
The state notes that on April 28, 1997, the trial court, upon defense counsel's motion, continued the trial date to allow defense counsel the opportunity to review the state's DNA analyst's report. Furthermore, the record reveals that defense counsel and appellant were fully aware that the continuance would be charged against appellant. Consequently, no statutory speedy trial violation occurred.
Accordingly, based upon the foregoing reasons, we overrule appellant's sixth assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Pickaway County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Exceptions.
Kline, P.J.: Concurs in Judgment Opinion as to Assignments of Error I, II, IV, V VI; Concurs in Judgment Only as to Assignment of Error III
Grey, J.: Concurs in Judgment Opinion*
For the Court
 BY: _______________________ Peter B. Abele, Judge
 NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.
[2] Appellant also refers us to four other instances of alleged misconduct. See tr. at 55; tr. at 78; tr. at 98; tr. at 104. Upon our review of the specific pages of the transcript, however, we are unable to discern to which statements appellant refers. Additionally, we note that one of the instances to which appellant refers are statements defense counsel, not the prosecutor, made concerning whether the defendant has to take the stand. See tr. at 56.
* Lawrence Grey, retired, sitting by assignment of the Ohio Supreme Court in the Fourth District.